at all. Mr. Bobrovsky, good morning. Good morning, Your Honors. My name is Mark Bobrovsky. I represent Diana Del Grosso, Ray Smith, Joseph and Cheryl Hatch, Kathleen Kelly, Andrew Wilkland, and Richard Kosiba. These are the petitioners. They live in close proximity to the Grafton and Upton Railyard in the town of Upton. This is a facility that we're discussing this morning, a wood pellet manufacturing facility that the GNU classifies as one of a kind. They're proud of it. They take credit for being entrepreneurial on point. They started the operation about 2010. The facility is located within the 38-acre yard that they rent from the landowner in the town of Upton. The facility does not comply with the Upton Zoning Bylaw provisions as follows. First, it would require a special permit as a manufacturing facility. Second, it would require site plan approval from a different board. Site plan approval is typically used to fit this into the community, measuring things like landscaping, noise, lighting controls. It probably requires a variance with regard to height and possibly setbacks. And then there are various specific performance standards within the Upton Zoning Bylaw that I've just mentioned with regard to noise, dust, and lighting. The facility causes noise, it causes glare, and it's a total disruption of the neighborhood character, the neighborhood being the location where my clients reside. The pellets are delivered to the facility in hopper cars. It's bulk transport. Do you agree that in order to have the pellets loaded onto trucks that they have to be bagged? I don't. The facility that operates at this location is constructed in order to take them off the truck, transfer them off the car, I'm sorry, and then vacuum them, screen them, repelletize them. No, I don't think you're answering my question. The pellets are transported by the railroad in hopper cars. In order to load them onto the trucks, is it not the case that they have to be bagged? I don't believe that that's been demonstrated. In order to sell them to the public, yes, they have to be bagged. In order to take them off the hopper car and move them to a facility, no, I don't think that they have to be bagged. The facility that they're transloading to is within the yard. They could just as easily take them in bulk to a facility which is offshore, not within the yard. And that's the key here. The Surface Transportation Board decided that the ease by which the hopper car allows these to be transported to the yard somehow translates into a preemption for the manufacturing facility. As I'm about to argue, it literally turns prior case law on its head. So the basic principle here is that the 105.01B preemption means that there must be transportation performed by a rail carrier. Transportation, I agree, has been broadly defined. It includes a transloading facility. It does include the transloading facility, correct, and it also includes a storage facility. So why isn't this bagging it part of transloading so it can be put on trucks? Well, it goes beyond transloading. But, Counsel, take it a step at a time. Answer Judge Dyke's question, which is limited to bagging. Why isn't that properly within the definition of transportation by rail? Well, it's the work that's beyond the bagging, if you will. So you don't have a problem with bagging. Your problem is with the work beyond it. I'll accept that. Okay. And the bagging, but the bagging includes what I would define as a manufacturing process. Is that the repelletization or something more than that? They're not just taking it out of the hopper car and putting it in a bag. No, no, no. But what about is your argument based on the repelletization? In part. But you didn't argue that below, right? Well, we didn't know about it below. The railroad denied that they were repelletizing at the facility right through to the end of 2012, and only in a supplemental reply did they for the first time acknowledge that repelletizing was taking place. But how can you argue here something you didn't argue below? I argued in my reply brief that there was cause for us not to see that. This isn't a court case. Cause may be a good reason if this were an appeal from a lower court. But this is an appeal from an agency, and our jurisdiction only extends to those matters that the agency has adjudicated. So we can't hear matters that weren't raised before the agency. Well, if that is the case, Your Honor, then I would argue that the activities that we did argue before the agency still constitute manufacture. What is it in addition to the bagging? Well, the components would be the transfer to the facility, the vacuuming of the pellets as they come off of the hopper, the screening so that the broken pieces can be separated, the bagging at that point in time, and the pelletizing and the wrapping of the pellets. Those constitute manufacturing because they take a bulk product and they convert it into something which is readily marketable to both a wholesaler, a retailer, and a consumer. But as the board pointed out, they don't change the fundamental character of the product. They're still pellets. They're bagged differently. They're packaged differently. That's all correct. They do change the fundamental nature of the product in that they improve the product to the point where it can meet quality standards that the industry itself has imposed, and it renders it marketable. I included in my brief something that was in the record. Excessive fines represent loss of usable fuel and cause performance and maintenance problems. They're also a source of irritation for appliance owners when the dust escapes into the home during the pouring from the bag into the hopper. The fines are less likely to burn because they're easily blown away from the flame by combustion air. Fines cause performance problems, including loss of fuel feeding, if they build up on the sides of the hopper and reduce the opening size for the delivery system. Doesn't the dust in the broken pellets result from the transportation in the hopper cars? I'm sure that that has some cause and effect, yes. So my point is that it's not pellets in, pellets out, when you get from the hopper car into the transloading facility. The transloading facility takes the bulk product and converts it into a marketable, consumer-ready product. It adds value. That was a key feature in the New England Translate rail case. The court noted that adding value to a product constitutes manufacturing. When it comes off the rail car, can it then be sold in that condition to the consumer? No, for the very reasons that I just indicated in the footnote in my brief. So it can only be sold to the consumer after they go through the process that takes place that you're objecting to? I think that's an industry-wide standard, yes. They have to do those elements that I mentioned in order to get it ready for the consumer. Otherwise, it would literally harm the equipment that the consumer has in order to burn them. So the manufacturer is a situation in which it adds value or it changes the nature of the bulk product here. And I think that whether or not you give me the repelletizing component of the operations within the facility as properly before you, I think that the other operations, which are properly before you, do constitute that. In the New England Transrail case, that issue was the bailing and wrapping of municipal solid waste. So municipal solid waste, or MSW, came into the facility. It was screened for hazardous content, and then it was bailed and wrapped. And there was a challenge that that constituted manufacturing. The court said if you're bringing it into the facility and you're facilitating rail transportation by bailing and wrapping, promoting the use of different types of rail cars, that's within the definition of transportation. But in another case involving the GNU in Milford, they brought in materials, steel in particular, and they fabricated it. They cut it and they welded it. The Surface Transportation Board had no problem calling that manufacturing because it altered the nature of the product. It was steel in, steel out, but it was manufacturing, according to the STB. With regard to the board's conclusion that no manufacturing occurred here, don't we owe some deference to the board's expertise? Yes, we do. So doesn't that make your argument very difficult? Because the products are essentially the same. Yes, they're bagged differently, they're palletized, they're more commercially readable, but they are essentially the same product. And I'm struggling with the notion of how the board can be said to have gone beyond its expertise in pegging its decision to that rather undeniable fact. I think that the board's discretion ends at the point where the rail transportation ends. So what happens at the facility in Upton is that these goods come in by bulk, they're transloaded in the facility, they go through the five-step process that I just mentioned, and at that point in time they never see a rail car again. They're trucked off the premises. They go to Lowe's or Home Depot or whatever big boxes. But if that's really your thesis, then it doesn't make any difference what the railroad did with the pellets, because that argument depends on the notion that once the hopper cars arrive, if there is going to be no further transport by rail, that's the end of transportation by rail. But that's not what all the STB precedents say. But the STB precedent does not go so far as to allow for the construction of manufacturing facilities within yards if the manufacturing facility opens up a broader range type of car that can be used in the transport. It stands for the proposition, New England Transrail in particular, that you can have a facility in the yard if it promotes rail transportation thereafter, because the processing facilitates that. This is exactly the opposite situation of New England Transrail. So the precedent, I believe, doesn't apply. In this case, the material comes into the yard, it's manufactured, and it goes off. There's no reason, I ultimately submit, why the facility that's doing this work can't be located outside the yard. The broad range of rail transportation is still available to the railroad. They can bring it there already bagged, already pelletized in a boxcar. Admittedly, they couldn't fit as much as they would into a hopper, but that choice is theirs. They've chosen to bring it by hopper, and they've chosen to build a manufacturing facility in the yard in order to facilitate that. But there's no reason why that can't be done outside the yard with local control over the types of activities that we have here. There's nothing about that that in any way interferes with the options that the rail carrier has as to how to transport the goods to the town of Upton. The full range is still available. I also had an argument in my brief that we were improperly denied discovery, and I'll simply rely on the papers for that. Thank you. Thank you. Thank you. Mr. Light? May it please the Court, my name is Eric Light. I'm an attorney with the Surface Transportation Board here on behalf of the Board in the United States. I'd like to begin by highlighting two important – Suppose the railroad says we'd like to transport cattle in cattle cars. It's cheaper to do that. So we're not going to slaughter them and put them in reefer cars. We're going to slaughter them after the rail trip is concluded and before they're loaded into trucks for delivery. Why is that different from this case? Because that's changing the fundamental nature of the product as opposed to what was going on here. So the efficiency rationale isn't enough. Correct, Your Honor. I think what the Board said was something is a service related to rail transportation as long as it facilitates the movement of product by rail and also does not change the physical nature of the product itself. And that's what was occurring here. So what – let me give you another hypothetical. Suppose that here the bagging took place after the truck transportation to the retailer. Would that – and it was done by the railroad. Would that be exempt? If it was done at the retailer's facility? Yeah. I don't think so, Your Honor. And that's because – Well, I think it's too distant from the – It's not part of the transloading. Correct. It's too distant. It's not part of getting it from the railroad to the truck. So why wasn't the focus here of the Board on that very point, on getting it from the railroad to the truck? I didn't see findings in there that the bagging of the pellets was necessary to put them on the trucks. Am I mistaken about that? I believe you're correct, Your Honor, that that is not in the Board's decision. The Board just felt it was enough that it was – But isn't that an essential aspect of this, that there would have to be a finding that the bagging was necessary to put them for transloading onto the truck? I don't think it's necessary, Your Honor. I think it certainly helps. But, for example, New England Transrail, there the Board relied on an efficiency rationale in terms of the bailing and wrapping of the municipal solid waste. And so basically what the Board did in this case, it applied the same rationale as in New England Transrail to this transload operation. And I guess I'd like to just point out one thing about the New England Transrail, what was going on there. Counsel for the petitioners talked about how there's other sorts of things going on beside the repelletization. There's the vacuuming and screening. And then that changes the nature of the product. And I would point out that in New England Transrail, the municipal solid waste would come in. It was a proposed facility. So the plan was that it would come in and they would dump it on a big, large concrete floor. And the transloader would go through the municipal solid waste and pick out hazardous materials or anything that couldn't go into a landfill after the rail movement. And what the Board said was, well, that's still, even those activities, for example, picking out a refrigerator out of the municipal solid waste, that still comes within the Board's jurisdiction over transportation by rail carrier. So I just wanted to point out that even aside from repelletization, the activities that you're talking about are still within the Board's exclusive jurisdiction. Excuse me. Before you go further, we're talking about rail transportation, right, correct? Correct. Isn't the rail transportation and the ones that the goods are delivered? Well, no, Your Honor, because the – Why not? I mean, that's the way I would read it in plain English. Correct. Well, the statute, the Interstate Commerce Act, has a specific definition of transportation. And it is definitely not your common sense understanding of what transportation is. It includes a whole laundry list of things. Yes, I read them, and none of them include wood pelleting, screening, or vacuuming, or bagging. Right, but the key phrase it does include is services related to rail movement. And here the Board determined that a wood pellet transloading facility of this sort was a service related to rail transportation because it facilitates the movement of the pellets by rail, and that it does that by making the movement of pellets by rail much more efficient, which the petitioners do not dispute. Moreover, not only does it make it more efficient, but it makes it more efficient without changing the basic physical nature of the product itself. And I would suggest that, you know, this is an interpretation by an administrative agency. I know. I wasn't going to get to that because your agency is an expert on rail transportation. Are they an expert also on all kinds of manufacturing? No, Your Honor, but the Board does get a lot of cases where it has to determine where is the line between rail transportation and manufacturing begins. And so this is another instance of the Board using its expertise on that matter to, you know, decide an individual case. And I would submit that the definition of transportation, and even as it is defined in the Interstate Commerce Act, is still not clear, certainly not as it relates to the particular activities here. And so the Board was essentially defining or applying a definition which is not clear and therefore is entitled to deference in the application of that definition. Tim, I can't understand why the Board didn't focus on the bagging being necessary for the transloading and putting it onto the trucks. It seems to me that's an essential element of the conclusion here, that the mere finding of efficiency coupled with no major change in the product is not sufficient. Don't you also have to show that the bagging is part of the transloading process? No, Your Honor. It's not necessary to show that it's absolutely necessary to get it onto the trucks. The statutory definition is a service-related. I'm not saying absolutely necessary, but that that is part of the process of putting it onto the truck is the bagging. In other words, the definition that you're citing says services related to transportation. How do we know that bagging is sufficiently related to transportation? We don't know that just because there's a finding of efficiency. The thing that would make that clear would be the fact that bagging was a reasonably desirable way of putting the material from the trains onto the trucks, and we don't have that finding. That's the point. Well, I understand that's not there, but it's not necessary. But then how do we know that the bagging operation is reasonably related to the rail transportation without some sort of finding like that? Well, you know, the board is the agency which is charged with interpreting. Yes, if the board had made that finding, I would defer to it. But the board hasn't made that finding. But the board made the other finding that this does facilitate rail transportation, and that is enough under the statute. Well, it can't be enough under the statute because, as you agreed, if they did the bagging at the retail facility, that might help with the rail transportation and the efficiency of it, but that wouldn't be sufficient. It has to be related to the transloading, I would think. Well, in this case, it certainly was. Well, that may well be true, but we don't have a finding that that's the case. That's true. I would just submit that I think it's enough for the board to, you know, as the agency charged with administering the statute, it gets to interpret these words of the statute, and this is a reasonable interpretation of the statute, and it's entitled to deference. What is a reasonable interpretation of the statute? That a service related to rail transportation is one that both facilitates the movement of goods by rail and does so without changing the nature of the product. Yes, so then what do you do with Judge Dyke's example? Because if the bagging were done after the trucking at the retailer's premises, that would certainly facilitate the movement of the product. Well, in that case, I'm sorry, if those were the facts that were before the board, then the board might look to the fact that the bagging in that case was not necessary for the trucking operation, you know, the trucking portion of the movement. That's exactly the point. That's why we need a finding that it was necessary for the loading onto the truck or desirable for loading it onto the truck. I'm not sure why it's necessary. If a different set of facts comes before the board, the board might very well reach a different determination. They have to relate it to transportation is the problem, and they haven't dotted the I's and crossed the V's in that respect. They certainly have related it to transportation by saying that it makes the movement of rail, movement of woodpiles by rail more efficient. Yeah, but it would make the movement by rail more efficient if you actually put a pellet manufacturing plant in the rail yard. Right, but then that would be manufacturing. I know that. So the mere fact that something makes movement by rail more efficient can't alone be enough. Correct, and the board didn't say that alone was enough. What the board said was it makes it more efficient, and it does so without changing the physical nature of the product. So you can't put a manufacturing facility on a rail yard and claim preemption under the rationale of the board here. There's something else that I would like some help on. Why are you denying discovery? When I read the statute, it says that they're entitled to any matter, not privilege, which is relevant to the subject matter involving the proceeding other than informal proceedings, which sounds very much like rules of procedure in this court. Yes, Your Honor. The board's rule does make discovery generally available. And in most cases you do. Correct. And what happened here was when the board initiated this decision, this proceeding, it said that the record contained the lease agreement and the terminal transload agreement, and that should be enough to determine basically the issue of whether this was transportation by rail carrier. And the petitioners challenged that before the full board, and they argued two things. They argued, well, you generally allow discovery in declaratory order cases, which doesn't answer the question of why you needed additional discovery given what was already in the record. And the second thing they argued was there's new evidence from this other case, this federal litigation involved in the town of Grafton and the GNU Railroad, and it shows that there's financing of a proposed propane transload facility by other parties. And what the board said was, well, that is not relevant to this case. And so our position is the petitioners did not explain to the board why the initial decision denying discovery was wrong. Unless the court has any other questions, we ask that the petition for review be denied. Thank you. Thank you. Howard? Good morning. Good morning. James Howard on behalf of the intervener at Grafton and Upton Railroad. If I may, I'd like to address the question that your honors have been raising about the nature of the bagging and its relationship to making rail transportation better or more efficient. I think it has to be reviewed in the context of the arguments the petitioners made, namely that all of these various steps in the process from bringing the rail cars into the yard to moving the trucks out of the yard, all of those together were manufacturing. The board reviewed our evidence, which was to the effect that bagging was, well, all of these steps are necessary for transloading. By definition, you can't transload, which means transfer from one mode of operation, transportation, namely rail, to truck without going through these various steps. What is the evidence in the record about that? Wait, wait, wait, that you have to bag before you put it on the truck. There's evidence in the record, testimony from Grafton and Upton witnesses as well as pellet manufacturers, that bagging without putting on pellets and shrink wrapping will result in tremendous damage to the pellets. That's why the manufacturers went to rail hopper cars in the first place. They had originally been sending their pellets across country on trucks and incurring a lot of damage. What is repelletizing? Repelletizing is simply sifting out the small broken pieces and pressing them back together. So you're making new pellets? No. Well, you're making something. Well, but the record here, again, is pretty clear from the manufacturers that the manufacturing process ends at their plant. They take sawdust, they put it in a water solution, they press it through dyes, and when those dyes come out, that's the pellet. Yes, and then you end up with a whole bunch of broken pellets that you want to make into pellets again. Well, the alternative was that they were being disposed of as waste. That may be the case, but, in fact, you are making pellets. Well, I would say it's not a manufacturing of pellets in the same sense as they manufacture them at the facility. It's the second manufacturing of the pellets then. Well, it's more like pressing together broken pieces as opposed to going. Isn't that what you do originally? Pardon? Isn't that what you do originally? You put this material together, make it into a round whatever it is? The experts in the industry explained in the record that sawdust is taken, it's put into some kind of water solution, it's dried, and then it's put through a dye, and when it comes out of that dye, you have a pellet. And those pellets that aren't broken are put in bags. They're unchanged. Those that are? Those that break can now be pressed together, and they're distributed in the bags. Okay. Thank you. Thank you.